UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S.K., *individually and on behalf of SH.K., a child with a disability*,<br><br>                              Plaintiff,<br><br>                  -v.-<br><br>CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK,<br><br>                              Defendant. | 17 Civ. 6043 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff S.K. brings this action on behalf of herself and her daughter, Sh.K., pursuant to the Individuals with Disabilities Education Act (the "IDEA," formerly known as the Individuals with Disabilities Act), 20 U.S.C. §§ 1400-1482, against Defendant City School District of the City of New York (better known as the New York City Department of Education, or "DOE").[1]  Plaintiff brings this action to: (i) seek reimbursement for costs incurred in sending Sh.K. to a private school for the 2016-2017 school year; and (ii) seek review of the June 2017 decision by the State Review Officer (the "SRO") that denied Plaintiff's attempt to obtain that reimbursement from the DOE.  Plaintiff argues that the SRO erred both in finding that the DOE's proposed school placement was capable of implementing Sh.K.'s Individualized Education Program ("IEP")

---

[1]     The Court does not expressly name the child or the parents because "in an action commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA, the Plaintiff should be permitted to proceed, as a matter of course, using initials in place of full names in public filings with the Court."  *P.M.* v. *Evans-Brant Cent. Sch. Dist.*, No. 08 Civ. 168A (RJA), 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008); *see also* Fed R. Civ. P. 5.2(a); 20 U.S.C. § 1417(c).

because the school could not offer conductive education, and because the DOE would have placed Sh.K., who is not autistic, in a school designed for autistic students. The DOE argues that its placement would have provided Sh.K. with a free appropriate public education (or "FAPE"), and that the Court should largely defer to the SRO's decision.

The parties have cross-moved for summary judgment. For the reasons set forth in the remainder of this Opinion, the DOE's motion is granted, and Plaintiff's motion is denied.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    Sh.K.'s Background

At the time of the prior hearings in this action, Sh.K. was a twelve-year-old girl. (Def. Opp. 56.1 ¶ 8). She has significant disabilities, including

---

[2]    The facts in this Opinion are drawn from the parties' submissions in connection with their respective summary judgment motions, including Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("Pl. 56.1" (Dkt. #23)); Defendant's Local Civil Rule 56.1 Statement of Material Facts ("Def. 56.1 (Dkt. #26)); and Defendant's Response to Plaintiff's Local Civil Rule 56.1 Statement of Material Facts ("Def. Opp. 56.1" (Dkt. #27)). Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Court also draws from the Impartial Hearing Officer Decision ("IHO Dec."); the transcript of the hearing before the IHO ("Tr."); the State Review Officer Decision ("SRO Dec."); and the various exhibits contained in the record before the SRO ("Ex."). Because these latter documents were filed under seal, the Court references, where possible, publicly-filed materials that discuss their contents.

cerebral palsy, quadriplegic spasticity, a seizure disorder, and bilateral hearing loss, and she is required to use a gastronomy tube in order to supplement her diet. (*Id.* at ¶¶ 11-12). She is non-verbal and uses a variety of low-tech and high-tech systems and devices in order to assist her in communicating with others. (*Id.* at ¶¶ 13-16). She is also non-ambulatory and primarily relies on a wheelchair to get around. (*Id.* at ¶ 17). She has difficulty moving her head, hands, and legs; makes unintentional, involuntary movements; and requires assistance to eat, use the bathroom, and engage with other aspects of daily life. (*Id.* at ¶ 19). Sh.K.'s IEP describes her as having a disability classification of Traumatic Brain Injury ("TBI"). (*Id.* at ¶ 10). Nevertheless, those who know Sh.K. describe her as a "happy, personable, and curious kid," as well as bright and social with both adults and peers. (*Id.* at ¶ 9).

Prior to the events at issue in this action, Sh.K. was a student at the International Academy of Hope ("iHope"), previously known as Standing Tall. (Pl. Br. 3). Plaintiff had enrolled her daughter at Standing Tall after the DOE placed Sh.K. at P.S. 138, which Plaintiff believed to be an inappropriate placement. (*Id.*). The present controversy resulted from Plaintiff's decision to enroll Sh.K. at Pathways Children's Services ("Pathways") for the 2016-2017 school year. (*Id.* at 1).

---

For ease of reference, Plaintiff's opening brief is referred to as "Pl. Br." (Dkt. #22); the DOE's opening brief as "Def. Br." (Dkt. #25); Plaintiff's opposition and reply as "Pl. Reply" (Dkt. #28); and the DOE's opposition and reply as "Def. Reply" (Dkt. #30).

## 2. The Development of the 2016 IEP

On June 9, 2016, a Committee on Special Education ("CSE") convened to discuss and develop an IEP for Sh.K. for the 2016-2017 school year. (Def. Opp. 56.1 ¶ 29; SRO Dec. 3). The CSE consisted of a DOE special education teacher, Emilce Ortiz; a school psychologist, Dr. Sheila Paris; Plaintiff; and three teachers from iHope. (Def. Opp. 56.1 ¶ 36). Prior to the 2016 IEP meeting, the CSE reviewed progress reports from iHope from the prior school year; Sh.K.'s prior IEP; a classroom observation conducted by Dr. Paris; a social history update of Sh.K.; and a psychological evaluation of Sh.K., that had been commissioned by Plaintiff. (*Id.* ¶ 30).

The 2016 IEP made numerous recommendations for the 2016-2017 school year, including that Sh.K. be placed in a 12-month academic program in a specialized school, as well as in a classroom with a ratio of six students to one teacher and one paraprofessional (also known as a "6:1:1" ratio). (Def. 56.1 ¶¶ 12-15). The IEP also recommended that Sh.K. receive related services, such as speech therapy, occupational therapy, physical therapy, and hearing education services. (*Id.* at ¶ 14). The IEP recommended that Sh.K. be provided with a full-time 1:1 health paraprofessional, a full-time 1:1 transportation paraprofessional, and a dynamic-display speech-generating device. (*Id.* at ¶ 15).

Relevant to this action, the IEP set 19 annual goals, spanning the subjects of literacy, math, speech, hearing education, physical therapy, and occupational therapy. (SRO Dec. 19). Three of the 19 annual goals came

under the heading of "Conductive Education." (Def. 56.1 ¶ 50).[3] The IEP's

three conductive education goals included: (i) Sh.K. would carry out a series of

passive and active exercises to reduce her spasticity in her lower extremities;

(ii) Sh.K. would improve the strength of her grasping, by grasping and releasing

objects with proper palmar grasp and minimal manual facilitation while

wearing arm gaiters; and (iii) Sh.K. would learn to use her upper and lower

extremities actively and functionally during a variety of gross motor tasks in a

variety of positions, with minimal manual facilitation. (*Id.* at ¶ 50).

### 3.    Sh.K.'s Placement at Spectrum

On June 9, 2016, the DOE sent a School Location Letter to Plaintiff

stating that the IEP's recommended services would be provided at M094 at

M188 – 01M188: P.S. 188 The Island School (also known as The Spectrum

School, or "Spectrum"). (Def. Opp. 56.1 ¶ 53). Plaintiff visited the school twice

(*id.* at ¶ 54), and then sent the DOE a letter on June 21, 2016, informing it

that she would be enrolling Sh.K. at Pathways instead of at Spectrum (*id.* at

¶ 63; Dkt. #20, Ex. J). Although Plaintiff expressed numerous concerns with

the DOE's placement, she noted in relevant part her understanding, based on

her visits to Spectrum, that the school was populated entirely by autistic,

---

[3]     Conductive education is a methodology that was developed by a Hungarian doctor in
1945 who theorized that people with disabilities are characterized by disintegrated
functioning, and that coordinated functioning can be developed through an indirect
cognitive route involving teaching and learning. (Def. Opp. 56.1 ¶ 47). Sh.K.'s
conductive education teacher at Pathways described conductive education as "a holistic
approach to habilitation or rehabilitation" that "improves a student's motor skills and
problem-solving abilities to increase independence." (Def. 56.1 ¶ 54 (internal brackets
omitted)).

ambulatory students, and that the school did not offer conductive education. (SRO Dec. 3).

### 4. Proceedings Before the Impartial Hearing Officer

On July 6, 2016, Plaintiff filed a due process complaint notice with the Impartial Hearing Office of the DOE. (Def. 56.1 ¶ 28). On July 26, 2016, Judith Kramer, the Impartial Hearing Officer ("IHO") at all relevant times in this action, held a hearing to determine Sh.K.'s pendency placement, which she determined to be Pathways. (*Id.* at ¶¶ 29-30). On August 1, 2016, Plaintiff filed an amended due process complaint notice with the Impartial Hearing Office. (*Id.* at ¶ 31). Plaintiff alleged that the DOE failed to offer Sh.K. a FAPE for the 2016-2017 school year because: (i) Sh.K. would not have been grouped appropriately in a district 6:1:1 classroom because she did not match the district's description of the types of students for whom the 6:1:1 configuration was intended; (ii) the students that Plaintiff observed at Spectrum during her visit had significantly different physical, communication, and social needs than Sh.K.; (iii) Plaintiff was informed that Spectrum only offered related services in 20 to 30 minute sessions, as opposed to the 60 minutes recommended by the IEP; and (iv) Spectrum did not offer conductive education. (SRO Dec. 4). Plaintiff also asserted that Pathways was an appropriate placement, and requested both that the DOE provide Related Service Authorizations ("RSAs") for several services and that the DOE fund Sh.K.'s tuition at Pathways for the 2016-2017 school year. (*Id.*).

The hearing before the IHO commenced on October 14, 2016, and continued over five non-consecutive hearing dates to December 20, 2016. (Pl. Br. 6; SRO Dec. 4). Over the course of the hearing, the IHO heard testimony from Emilce Ortiz, the special education teacher who had been part of the CSE; Estelle Osofsky, a school psychologist with the DOE; Ashley Hodge, the assistant principal at Spectrum; Sara Naegele, an administrator at Pathways; Philippa Crane, a conductive educator at Pathways; and Plaintiff. (IHO Dec. 1). Of particular relevance to this action, the IHO heard testimony from Hodge about the ways in which Spectrum could have implemented the 2016 IEP (Tr. 168:13-208:8), and from Plaintiff about what she observed during her visits to Spectrum (*id.* at 233:13-243:5).

On February 13, 2017, the IHO issued her decision. (Pl. 56.1 ¶ 2). The decision first laid out the IHO's findings of fact. Among other things, the IHO found that the 6:1:1 classroom "is recommended for children with Autism as well as those who present with similar needs in the area of communication." (IHO Dec. 7). Moreover, the IHO found that if Sh.K. had attended Spectrum, she "would have had the opportunity to socialize and learn together with children who are verbal and non-verbal, all of whom would have been on the same functional level academically and socially." (*Id.* at 11). The IHO noted that Plaintiff had visited Spectrum twice after receiving the DOE's letter recommending placement there, and that Plaintiff had claimed to observe that Spectrum neither had any other students in wheelchairs nor offered conductive education. (*Id.*). The IHO also noted Plaintiff's observation that, in a classroom

that would have been age-appropriate for Sh.K., all of the students were on the autism spectrum. (*Id.*). Nevertheless, the IHO credited Hodge's testimony that Spectrum would have been able to provide Sh.K. with the recommended related services for which the IEP called, and found that "[t]he recommended school would have been able to implement the management needs detailed in the IEP." (*Id.* at 12).

Turning specifically to the composition of Sh.K.'s potential classroom, the IHO found that Sh.K. "would have been with other children [who] were also acquiring language or who have minimal language." (IHO Dec. 12). The IHO found that the other students were "non-verbal and, like the child, use a communication device to state their wants and needs and to participate throughout the course of the school day in their academic classes and in their content specialty classes." (*Id.*). The IHO noted that "[t]here were students who use eye gaze and facial expressions"; that the "classroom was equipped with modifications to minimize visual and sound distractions"; and that "[l]earning [was] both individualized and taught in a group." (*Id.*). In terms of academics, the IHO found that "the children in the class were on the same working and functional level in the areas of literacy and math." (*Id.*).

The IHO also made a lengthy series of findings regarding conductive education. The IHO found that Sh.K. "had a section on her IEP entitled 'conductive education' which was listed separately from her special education progress and achievement." (IHO Dec. 8). The IHO explained that "[c]onductive education is [a] term contributed to the IEP by iHope staff." (*Id.*).

The IHO noted conductive education's background and aims, such as that conductive education "is a holistic approach to rehabilitation and habilitation [whereby] children learn to be active learners in their environment and develop gross, fine[,] and oral motor skills so they can build their functional self-help skills." (*Id.* at 9). The IHO found that "[t]here are only three places in the world [that] train individuals to be conductive educators," only one of which is in the United States. (*Id.*). The IHO acknowledged that conductive education "is not identical to physical therapy" (*id.* at 8), but noted that the conductive education goals in the IEP were "geared to improve strength and movement, improving gross motor tasks as well as grasping and releasing objects" (*id.*). The IHO expressed a degree of skepticism about conductive education, noting that "[t]here has been very little research done to establish the effectiveness of conductive education." (*Id.* at 9). Crucially, the IHO found that Spectrum "would have been able to effectuate all three goals listed under conductive education with the assistance of the teacher, occupational therapists ["OTs"], physical therapists ["PTs"][,] and paraprofessional. These goals would have been worked on 1:1 with the child and in the classroom." (*Id.* at 13).

The IHO began her Conclusions of Law by noting the relevant standards governing the IDEA, and specifically that the DOE "need only … provide the child with a program and placement [that] is reasonably calculated to provide the child with an educational benefit." (IHO Dec. 17). The IHO noted that Plaintiff's allegations "involve only the recommended placement and the inability of the staff at PS 188 to implement the mandate of the IEP as written,"

9

as opposed to challenging the IEP. (*Id.* at 18). The IHO acknowledged that Plaintiff had the following concerns: (i) "the placement was inappropriate because the children in the 6:1:1 classroom to which the child would have been assigned are generally aggressive and self-abusive with difficulty acquiring language and social skills"; (ii) "the children at PS 188 in the [6:1:1] classroom are all classified as having autism[,] which isn't the same as TBI"; and (iii) "the goals on her IEP for conductive education cannot be met at PS 188." (*Id.* at 18).[4] The IHO addressed each contention in turn.

The IHO dismissed the first contention, regarding Plaintiff's characterization of the children in the 6:1:1 classroom, as "purely speculative," finding that Plaintiff's "stereotypical description of autistic children is not based on facts placed into this record." (IHO Dec. 18). As to the second contention, the IHO concluded that even though there are differences between students with TBI and students with autism, those differences were insufficient to preclude them from being taught in the same classroom. (*Id.*). Instead, the IHO held that "[c]hildren must be and are placed according to their functional abilities." (*Id.*). The IHO noted the numerous functional similarities between Sh.K. and the students in the Spectrum classroom, including that the classroom had students who, like Sh.K., were either acquiring language or had minimal language skills; were non-verbal and used communication devices;

---

[4]     The IHO also noted Plaintiff's potential argument that Spectrum would not provide Sh.K. with related services for the duration required by the IEP (IHO Dec. 18), but summarily dismissed that argument both because it had not been alleged in the amended request and because Hodge credibly testified that Sh.K. would in fact have received the mandated related services at Spectrum (*id.* at 19).

used eye gaze and facial expressions; and were on the same working and functional level in math and literacy. (*Id.* at 18-19). Given these similarities, and the fact that the classroom was equipped to handle Sh.K.'s other needs, such as modifications to reduce distractions and the utilization of sign language, the IHO held that Spectrum's 6:1:1 classroom was an appropriate placement for Sh.K. (*Id.* at 19).

Finally, the IHO turned to the issue of whether the DOE had denied Sh.K. a FAPE by proposing a placement at a school that did not have a conductive educator. (IHO Dec. 19-22). Given that Plaintiff's argument rested entirely on the fact that three of the 19 annual goals fell under the category of conductive education, the IHO explained that the central inquiry was "what portions of the IEP are 'requirements' and what portions are merely descriptions of what the team hopes can be achieved during the school year." (*Id.* at 19). The IHO noted that, since conductive education was neither a part of special education nor a related service, the DOE's only obligation was "to make a good faith effort to assist the student to achieve the annual goals." (*Id.* at 20). The IHO held that Sh.K.'s conductive education goals "could be met by the ... related services providers and her paraprofessional even though the progress made on these goals would not be measured by a conductive educator." (*Id.*).

In so holding, the IHO found that "[n]o studies have shown a difference between the children who received conductive education and those who received traditional treatments." (IHO Dec. 21). "That the DOE chose to utilize

the term conductive education, which the research acknowledges is very much like physiotherapy, on the IEP should not preclude a PT or an OT … to work on the goals or from measuring the goals." (*Id.*). The IHO also relied on the fact that a PT or OT would be entirely capable of working on the three conductive education goals with Sh.K. (*Id.*). Indeed, the IHO noted that both Plaintiff and Sh.K.'s current paraprofessional — neither of whom is a conductive educator or even a trained therapist — were able to work on Sh.K.'s conductive education goals without a conductive educator present. (*Id.* at 20 n.5). The IHO held that "this [manner] of implementation of the IEP is reasonably calculated to provide the child with an opportunity to obtain educational benefit." (*Id.* at 21).

The IHO also distinguished *F.B.* v. *N.Y.C. Dep't of Educ.*, 132 F. Supp. 3d 522 (S.D.N.Y. 2015), on which Plaintiff relied for the proposition that the DOE was required to provide a conductive educator because one was referred to in the goals section of the IEP. (IHO Dec. 20). In *FB*, the IHO explained, "it was held that the DOE failed to provide a student an appropriate education when … the classroom teacher testified that she could not implement the student's IEP goals of using the well established 'floor-time' methodology for teaching an autistic child." (*Id.*). While in that case, "the DOE offered nothing to counter that the public school was incapable of implementing at least four of the IEP's seventeen goals," in Sh.K.'s case, "the DOE offered testimony that all of the goals on the IEP could be met[,] including the three goals in the IEP pertaining to conductive education." (*Id.*). The IHO determined that "[a]s long as the DOE can implement the goals as the assistant principal [Hodge] stated she could,

12

the DOE can fulfill its good faith effort to assist the child in achieving her goals." (*Id.* at 21).

Beyond determining whether the DOE had satisfied its burden of showing that it had provided a FAPE to Sh.K., the IHO also briefly addressed whether Pathways was an appropriate placement (she indicated that it was not), and whether Plaintiff had demonstrated that the balance of equities were on her side (the IHO indicated that she had not). (IHO Dec. 22-23). However, for reasons that will become apparent below, these parts of the IHO's decision are immaterial to this Court's ruling today. The IHO concluded by denying Plaintiff her request for tuition reimbursement and RSAs at Pathways. (*Id.* at 23).

### 5. Proceedings Before the State Review Officer

On March 27, 2017, Plaintiff appealed the IHO's decision to the Office of State Review of the New York State Education Department. (Def. 56.1 ¶ 35). Plaintiff raised numerous challenges against the IHO's decision, including: (i) the IHO erred in finding that Sh.K. would have been grouped with functionally similar peers at Spectrum; (ii) the IHO erred in finding that Sh.K. did not require conductive education, and that the DOE could have implemented the IEP's conductive education goals through an OT and PT; (iii) the IHO reached improper conclusions regarding conductive education because the IHO improperly accepted and relied upon documents submitted by the DOE; and (iv) the IHO improperly relied upon retrospective testimony in determining that Spectrum was capable of implementing the IEP's conductive

13

education goals.  (SRO Dec. 5).  Plaintiff also challenged the IHO's conclusions regarding whether Pathways was an appropriate placement and whether Plaintiff had demonstrated that equitable considerations were in her favor. (*Id.*).  In response, the DOE primarily argued that (i) conductive education goals were included in the IEP because iHope — Sh.K.'s placement at the time of the CSE meeting — used that terminology to describe its adapted physical education program; (ii) the conductive education goals could be implemented by the personnel available at Spectrum; (iii) Spectrum was an appropriate placement because Sh.K. would have been grouped with peers with similar needs and academic functioning levels; and (iv) the IHO did not rely on retrospective evidence.  (*Id.* at 6).  The DOE also argued in favor of affirming the IHO's finding that Pathways was not a proper placement and that Plaintiff was not entitled to tuition reimbursement.  (*Id.*).

On June 1, 2017, the SRO issued a 25-page decision broadly affirming the IHO.  (Def. 56.1 ¶ 36).  The SRO first provided a lengthy and detailed factual and procedural history (SRO Dec. 2-6), followed by a thorough recitation of the standards governing cases brought under the IDEA (*id.* at 6-8). The SRO then turned to Plaintiff's challenge regarding Sh.K.'s functional grouping.[5]  The SRO concluded that the evidence in the hearing record supported the IHO's conclusion that Sh.K. was appropriately functionally

---

[5]     The SRO also addressed several smaller issues, such as whether the IHO erred in admitting and relying upon certain documentary evidence (SRO Dec. 8-9), or whether Plaintiff had properly brought a challenge against the IEP itself (*id.* at 10).  However, since neither of those issues was raised before this Court, this Opinion will not recount the portions of the SRO's decision dealing with them here.

grouped in the proposed 6:1:1 classroom. (*Id.* at 11). The SRO noted that while parents have a right to participate in the decision-making process regarding the "educational placement" of their child, they do not have a right to participate in the selection of their child's classmates. (*Id.* at 11-12). Moreover, the SRO explained that while New York State regulations require that students in special classes be grouped with students having similar individual needs, the student's level of physical development may not be the sole basis for determining the student's functional grouping. (*Id.* at 12). Instead, state regulations require consideration of the student's "levels of academic or educational achievement and learning characteristics"; "levels of social development"; "levels of physical development"; and "the management needs of the students in the classroom." (*Id.*).

Having explained the governing standards regarding functional grouping, the SRO proceeded to conduct a detailed review of Sh.K.'s skills and needs, as described in the 2016 IEP. (SRO Dec. 12-15). Specifically, the SRO dedicated four pages to discussing the IEP's description of Sh.K.'s academic functioning in both math and literacy; her communication skills; her hearing education development; her need for highly structured, specialized settings; her social development; her progress in her conductive education goals, as well as her general physical development; and her highly intensive management needs. (*Id.*).

The SRO then credited Hodge's testimony that students in Sh.K.'s proposed class would have had similar academic and emotional needs as Sh.K.

15

(SRO Dec. 16). The SRO noted Hodge's testimony that, similarly to Sh.K., there were students in the class who "were nonverbal and used communication devices and sign language"; "students who employed eye gaze and facial expressions to participate in lessons and express preferences"; and students who "used objects, pictures of objects, and symbols, in addition to communication switches." (*Id.*). The SRO also credited Hodge's testimony that the students were academically similar to Sh.K., since students in the proposed class were working at the pre-primer level, and that similar instructional strategies and accommodations would be utilized for Sh.K. and the students in the proposed class. (*Id.*).

The SRO found that while it was true that Sh.K.'s other classmates would have been both autistic and ambulatory, her differing physical needs could not be the sole basis for determining placement. (SRO Dec. 16). Instead, the SRO found that "the student's physical development and physical needs are not such that placement in the proposed 6:1:1 classroom would have been inappropriate[,] considering the student was provided with continual adult supervision via a 1:1 paraprofessional throughout the duration of the school day." (*Id.* at 16-17). Thus, the SRO found no error in the IHO's determination that Sh.K. was "suitably grouped for instruction with students with similar needs in the proposed [6:1:1] classroom." (*Id.* at 17).

The SRO then turned to Plaintiff's challenges regarding conductive education. Specifically, the SRO addressed "whether the June 2016 IEP adopted conductive education, and, if so, could the assigned public school site

implement the June 2016 IEP, including those goals designated as conductive education goals, without having a conductive education provider on staff." (SRO Dec. 17). The SRO first conducted a comprehensive survey of relevant case law in the Second Circuit concerning the effect of an IEP incorporating the language of a specific methodology. (*Id.* at 17-18). The SRO noted that "the Second Circuit has hesitated to find an IEP substantively adequate 'when the reports and evaluative materials present at the CSE meeting yield a clear consensus' regarding methodology." (*Id.* at 18 (quoting *A.M.* v. *N.Y.C. Dep't of Educ.*, 845 F.3d 523, 541-45 (2d Cir. 2017))).

The SRO further noted that "courts [in the Second Circuit] have been divided on the impact of a CSE adopting annual goals from private progress reports or evaluations and including them on a student's IEP without specifically adopting the methodology used in the private school." (SRO Dec. 17). The SRO compared *FB,* where the district court found that an IEP adopted a specific methodology by listing goals that referenced terminology specific to that methodology, with other courts that "have concluded that goals which incorporate some terminology or jargon specific to a methodology can nonetheless be implemented without the use of a specific methodology when such terms have a 'relatively common meaning' that would not 'prevent a teacher or therapist from implementing the IEP's goals.'" (*Id.* (comparing *F.B.*, 132 F. Supp. 3d at 550-51, with *G.S.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 5187 (RA), 2016 WL 5107039, at *11 (S.D.N.Y. Sept. 19, 2016))).

Finally, the SRO cited to *N.B.* v. *New York City Department of Education,* in which the district court found that although "the current and better view" is that an IEP's incorporation of goals particular to a specific methodology was an implicit adoption of that methodology, parents must still offer non-speculative evidence showing that the DOE's proposed placement cannot implement the methodology-oriented goals. (SRO Dec. 17 (citing No. 15 Civ. 4948 (AT), 2016 WL 5816925, at *6 (S.D.N.Y. Sept. 29, 2016))). The SRO further quoted *N.B.*'s finding that "[t]estimony that a school did not exclusively use one methodology but instead would individualize its methods for a given student supports rather than undermines [the school's] ability to implement [the] IEP." (*Id.* (citing 2016 WL 5816925, at *6)).

The SRO next provided an overview of how conductive education was portrayed in the hearing record, detailing the methodology's philosophy, goals, and exercises. (SRO Dec. 18-19). The SRO relied heavily on Crane's testimony in her description of what conductive education entails. (*Id.*). The SRO then considered whether the IEP in fact adopted the conductive education methodology. The SRO noted that of the 19 annual goals and 48 short-term objectives identified on the IEP, only three of the annual goals and eight of the short-term objectives were marked as pertaining to conductive education. (*Id.* at 19). The SRO explained that even though the goals were labeled as involving conductive education, "the only language in the goals or short-term objectives which could be considered associated with conductive education was a description of the role of a 'conductor' in one short-term objective," as well as a

statement that the student's progress would be evaluated daily by a conductive education teacher. (*Id.*). Moreover, the SRO noted Ortiz's testimony before the IHO "that the CSE labeled the annual goals as conductive education because that is how [iHope] described its physical education program." (*Id.* at n.10). Given the limited nature of conductive-education-specific language in the IEP, the SRO found that the IEP "did not necessarily adopt the use of conductive education methodology." (*Id.* at 19-20).

The SRO also determined that even if the IEP had adopted conductive education as a methodology, the record supported the IHO's finding that the conductive education goals could be implemented by physical therapists, occupational therapists, and other related services providers. (SRO Dec. 20, 22). The SRO generally observed that

> the three conductive education goals focused on the student's needs related to lower extremity spasticity, her emerging ability to grasp and release objects, and the limited functionality of her upper and lower extremities, all of which are generally consistent with the needs identified in the PT and OT portions of the June 2016 IEP.

(*Id.* at 20). The SRO drew direct comparisons between the three conductive education goals and the PT and OT goals, such as noting that the second PT goal, which "focused on improving the student's mobility," was consistent with the third conductive education goal's focus of increasing Sh.K.'s functional use of her lower extremities. (*Id.* at 21). As another example, the SRO noted the overlap between the second conductive education goal's focus on improving Sh.K.'s ability to grasp and release objects and the OT goals' exercises involving

19

reaching for craft supplies, rolling balls, and grasping and releasing wash

cloths and paper towels.  (*Id.* at 21).  The SRO found that

> comparison of the … IEP annual goals and short-term
> objectives labeled physical therapy, occupational
> therapy, and conductive education shows that overall
> they were designed to improve the student's gross and
> fine motor skills, and other than reference to
> measurement by a conductive education teacher, the
> annual goals labeled conductive education do not
> contain language unique to conductive education.

(*Id.* at 22).  Therefore, the SRO concluded that the conductive education goals

and short-term objectives could be addressed by personnel other than a

conductive education teacher.  (*Id.*).  Finally, the SRO noted that the relevant

inquiry was whether the IEP as a whole was likely to produce progress towards

Sh.K.'s goals absent the use of conductive education.  (*Id.* (citing *T.C.* v. *N.Y.C.

Dep't of Educ.*, No. 15 Civ. 2667 (KPF), 2016 WL 4449791, at *26 (S.D.N.Y.

Aug. 24, 2016))).  The SRO found that Sh.K.'s "needs addressed by the

conductive education goals were also addressed in the annual goals related to

OT and PT: therefore, any implementation failure limited solely to the three

[conductive education] goals … would not result in a denial of [a] FAPE."  (*Id.*).

The remainder of the SRO's decision focused on whether the IHO erred in

finding that equitable considerations were not in Plaintiff's favor.  (SRO

Dec. 23-24).  Although the SRO explained that she did not need to determine

whether equitable considerations did in fact favor Plaintiff, because she had

affirmed the IHO's finding that the DOE offered Sh.K. a FAPE, she nonetheless

reversed the IHO's finding against Plaintiff on that limited ground.  (*Id.* at 24).

The SRO found that the IHO "relied on irrelevant information and applied an

incorrect standard when determining that the parent did not demonstrate an entitlement to direct funding of the student's cost of attendance at [Pathways]." (*Id.*).  In sum, however, the SRO held that Sh.K. was not denied a FAPE, and dismissed Plaintiff's appeal.  (*Id.* at 24-25).  The one issue that the SRO failed to address, despite identifying it as an issue on appeal (*id.* at 5), was whether the IHO improperly relied upon retrospective testimony.

## B.    Procedural Background

This action was commenced with the filing of the operative Complaint on August 10, 2017.  (Dkt. #1).  The case was initially assigned to the Honorable Deborah A. Batts.  The DOE filed its Answer on December 13, 2017.  (Dkt. #9). On February 22, 2018, the parties proposed a briefing schedule for their cross-motions for summary judgment (Dkt. #12), which Judge Batts endorsed on February 27, 2018, with a revision made for the parties' Local Rule 56.1 statements (Dkt. #13).  Plaintiff filed her motion for summary judgment, along with accompanying memorandum and 56.1 statement, on April 27, 2018. (Dkt. #21-23).  The DOE filed its cross-motion for summary judgment, along with accompanying memorandum, 56.1 statement, and counter-statement to Plaintiff's 56.1 statement, on June 8, 2018.  (Dkt. #24-27).  On June 29, 2018, Plaintiff filed her reply brief and counter-statement to the DOE's 56.1 statement (Dkt. #28-29), and the DOE filed its reply brief on July 20, 2018 (Dkt. #30).  On November 14, 2019, Judge Batts referred the parties' cross-motions to Magistrate Judge Barbara C. Moses for a report and recommendation.  (Dkt. #31).  On February 20, 2020, this case was reassigned

to this Court, and the Court issued an Order that same day withdrawing the referral of the motions to Judge Moses.  (Dkt. #32).

## DISCUSSION

**A.  Applicable Law**

**1.  The Legal Framework**

The IDEA "requires states to provide disabled children with a 'free appropriate public education'" (a "FAPE").  *Florence Cty. Sch. Dist. Four* v. *Carter*, 510 U.S. 7, 9 (1993) (citation omitted); *see R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012).  In accordance with this mandate, school districts are required to create an IEP for each qualifying child in order to ensure that the child receives a FAPE.  *See R.E.*, 694 F.3d at 175.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A).  At the cornerstone of the IDEA is the requirement that the IEP be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207 (1982); *see also Endrew F. ex rel. Joseph F.* v. *Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("The IDEA . . . requires an educational program

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."); *Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

In New York State, each school district has a CSE that is responsible for developing IEPs for qualifying students within that district. *Gagliardo*, 489 F.3d at 107. A CSE is "comprised of members appointed by the local school district's board of education; it must include, among others, the student's parent(s), a regular or special education teacher, a school board representative, [and] a parent representative," and it may include others. *R.E.*, 694 F.3d at 175; N.Y. Educ. Law § 4402(1)(b)(1)(a).[6] The CSE is responsible for examining the student's level of achievement and specific needs in order to determine an appropriate educational program. *R.E.*, 694 F.3d at 175.

A school district's obligations do not cease with the formulation of the IEP. The district "must also implement the IEP, which includes offering placement in a school that can fulfill the requirements set forth in the IEP." *D.C. ex rel. E.B.* v. *N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 509 (S.D.N.Y. 2013) (quoting *O.O.* v. *District of Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008)). "The school district must provide special education and related services to a student with a disability in accordance with the student's IEP and

---

[6]    A "parent representative," also referred to as a "parent member," is a parent of another disabled student. This parent attends the CSE meeting to provide information and support to the parent of the student for whom the CSE meeting is being held. *See* N.Y. Educ. Law § 4402(a)(viii).

must make a good faith effort to assist the student to achieve the annual goals ... listed in the student's IEP." 8 N.Y.C.R.R. § 200.4(e)(7). Thus, "[s]chool districts may not assign a child to a school that cannot satisfy the IEP's requirements." *F.B.*, 132 F. Supp. 3d at 550 (internal quotation marks omitted) (quoting *M.O.* v. *N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir. 2015)).

If a parent believes that his or her child is being denied a FAPE, he or she may unilaterally enroll the child in a private school and seek tuition reimbursement from the district through the filing of a due process complaint. *M.O.*, 793 F.3d at 239 (quoting *Hardison* v. *Bd. of. Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 376 (2d Cir. 2014)); 20 U.S.C. § 1412(a)(10)(C)(ii); N.Y. Educ. Law § 4404(1). Upon the filing of a due process complaint, federal law mandates that the parent be provided with an impartial due process hearing before an Impartial Hearing Officer ("IHO"). 20 U.S.C. § 1415(f). In the impartial hearing, the school district bears the initial burden of establishing the validity of its plan. If the district fails to carry that burden, the parent must establish the appropriateness of his or her private placement and that the equities favor him or her. N.Y. Educ. Law § 4404(1)(c). Additionally, New York law requires a parent to pursue his or her claim first before an IHO; once the IHO renders a decision, either party may appeal the decision to the SRO. *Id.* § 4404(1), (2). After the SRO completes his or her review of the IHO's decision, either party may file an action in state or federal court seeking review of the SRO's decision. 20 U.S.C. § 1415(i)(2)(A).

## 2.    The Standard of Review

In IDEA cases, motions for summary judgment "serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled." *T.Y.*, 584 F.3d at 418.  For this reason, motions for summary judgment in IDEA cases are "an appeal from an administrative determination" that typically "triggers more than an inquiry into possible disputed issues of fact." *Lillbask*, 397 F.3d at 84 n.3 (citations omitted).

The federal court's role in reviewing these state administrative decisions is, however, "circumscribed." *R.E.*, 694 F.3d at 189; *see also T.Y.*, 584 F.3d at 417.  A federal court must give "due weight to the state proceedings, mindful that [the court] lack[s] the specialized knowledge and experience necessary to resolve questions of educational policy." *R.E.*, 694 F.3d at 189 (citation and quotation marks omitted).  "Keeping in mind this circumscribed role, the district court engages in an independent review of the administrative record and makes a determination based on a preponderance of the evidence." *M.B. ex rel. L.C.* v. *Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77-78 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).  Although the court's review of state administrative decisions "requires a more critical appraisal of the agency determination than clear-error review, [it] nevertheless falls well short of complete *de novo* review." *M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (citation omitted).  District courts may not "substitute their own notions of sound educational policy for those of the

school authorities which they review." *K.Y. ex rel. T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted); *accord W.A.* v. *Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 143 (2d Cir. 2019), *cert. denied*, No. 19-616, 2020 WL 283273 (U.S. Jan. 21, 2020).

"[C]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *M.H.*, 685 F.3d at 241 (citing *A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)). Where the IHO and SRO reach competing determinations, courts "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189. On the other hand, "where the SRO and IHO agree, deference to the conclusions of the administrators on this issue is particularly appropriate." *C.W.* v. *City Sch. Dist. of New York*, 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016) (internal brackets and quotation marks omitted).

The deference owed to an SRO's decision depends on the quality of that opinion. *R.E.*, 694 F.3d at 189. "Deference is particularly appropriate when the state hearing officer's review has been thorough and careful." *Id.* at 184 (citing *Walczak*, 142 F.3d at 129). In reviewing the administrative decision, a district court is directed to assess "the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater

familiarly with the evidence and the witnesses than the reviewing court." *Id.* at 189 (citation and quotation marks omitted). "[T]he district court should not disturb the SRO's decision if it 'is thorough, well-reasoned, and based on the record.'" *E.H.* v. *N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 546 (S.D.N.Y. 2016) (quoting *D.A.B.* v. *N.Y.C. Dep't of Educ.*, 630 F. App'x 73, 75 (2d Cir. 2015) (summary order)).

"Different types of findings are also accorded different degrees of deference. The SRO's findings regarding the IEP's substantive adequacy command more deference than determinations regarding whether the IEP was developed according to proper IDEA procedures." *E.H.*, 164 F. Supp. 3d at 547. Additionally, "more deference is due when this Court's determination rests solely on the same evidence presented to the SRO." *Id.*

**B.    Analysis**

On appeal from the SRO's decision, Plaintiff has narrowed her challenge to three grounds, two of which are related: (i) the SRO erred in finding that the DOE had placed Sh.K. in an appropriate functional group (Pl. Br. 14); (ii) the SRO impermissibly relied on retrospective testimony from Hodge in concluding that Spectrum could implement the IEP (*id.* at 10); and (iii) the SRO erred in finding that Spectrum could implement the IEP, and specifically the portions of the IEP concerning conductive education (*id.*). Although the DOE addresses the procedural and substantive adequacy of the IEP in its briefing (Def. Br. 7-9), the Court reads neither Plaintiff's Complaint nor her briefing as challenging

the IEP.  Therefore, the Court will only consider the three issues that have been presented to it.

### 1. The Court Defers to the SRO's Decision Regarding Sh.K.'s Functional Grouping

Plaintiff argues that the DOE's placement at Spectrum was inappropriate because it would have placed Sh.K. in a classroom populated entirely by ambulatory, autistic students, whereas Sh.K. is neither autistic nor ambulatory.  (Pl. Br. 14-16).  As detailed previously, the SRO engaged in a thorough, six-and-a-half-page analysis of Plaintiff's argument before rejecting it.  (SRO Dec. 11-17).  The SRO correctly noted both that state regulations require that students in special classes be grouped with students with similar individual needs, and that a student's physical needs may not be the sole basis for determining a placement.  (*Id.* at 12 (citing N.Y.C.R.R. §§ 200.6(a)(3)(iii), (h)(3))).  The SRO then conducted an exacting analysis of Sh.K.'s IEP, detailing, *inter alia*, her academic functioning, communication skills, and physical development and needs.  (*Id.* at 12-16).  The SRO concluded by noting Hodge's testimony that Sh.K. and her classmates would have had similar individual needs and abilities.  (*Id.* at 16).  Given all these similarities, the SRO reasoned that, despite Sh.K.'s unique physical needs, the proposed classroom at Spectrum was an appropriate placement.  (*Id.* at 16-17).  As the SRO noted, the relevant inquiry is not whether the placement is "the best possible group of children," but whether the students had similar needs.  (*Id.* at 17 (citing *E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010))).

Not only is the SRO's opinion thorough and well-reasoned, but it is also amply supported by the record. As the SRO noted, Assistant Principal Hodge directly testified to the similar needs shared by Sh.K. and the students that would have been in her proposed classroom. (Tr. 184:6-189:3). The only evidence that Plaintiff offers to counter Hodge's testimony is testimony offered by Sara Naegele from Pathways, who testified to having had experience teaching autistic students. (Pl. Br. 15; Tr. 342:6-10). Naegele did indeed testify that she perceived differences between the kind of instruction and care autistic students require as compared to students like Sh.K. (Tr. 403:10-11), but Naegele's testimony was not based on any personal knowledge of the students that would have been Sh.K.'s classmates at Spectrum. Instead, it was merely speculative testimony unconnected to the realities that Hodge described, and the SRO acted well within reason in crediting Hodge's testimony over Naegele's.

In the end, it is clear that Plaintiff's primary argument is that Sh.K. has different physical needs from her proposed classmates. (*See* Pl. Br. 16 (explaining that while "the children in the Spectrum School's 6:1:1 classrooms may be working on similar academic goals as Sh.K., … they are not functionally similar *physically*" (emphasis in original))). But as the SRO and this Court have noted, the law is clear that a student's physical needs may not be the sole basis for a placement. Given the persuasiveness of the SRO's analysis of this issue and Plaintiff's inability to undermine the validity of the

SRO's reasoning, the Court defers to the SRO and affirms its finding regarding Sh.K.'s functional grouping.

### 2. The SRO Did Not Impermissibly Rely on Retrospective Testimony

As part of her broader attack on the SRO's finding regarding Spectrum's ability to implement the IEP's conductive education goals, Plaintiff argues that both the IHO and the SRO improperly relied on retrospective testimony. (Pl. Br. 13-14). Specifically, Plaintiff asserts that both administrators improperly relied on testimony from Hodge concerning the ways in which Spectrum "could have modified its curriculum in order to implement the IEP's [conductive education] requirement." (*Id.* at 13). Plaintiff bases her argument on her understanding that an inquiry concerning the appropriateness of a placement "must be evaluated based on information known by a parent at the time of her placement decision." (*Id.* at 8).

The Court understands Plaintiff's argument to be that, either as a matter of Second Circuit precedent or as a function of persuasive authority from sister courts, the only information regarding a proposed placement that may be considered by an IHO or SRO is that which was subjectively known by a parent at the time of her placement decision. Plaintiff is correct that the IHO and SRO are forbidden from considering retrospective testimony. *See M.O.*, 793 F.3d at 244. But insofar as Plaintiff believes the bar on retrospective testimony to allow consideration only of information directly known by the parent, Plaintiff is incorrect.

The rule prohibiting retrospective testimony comes from *R.E.*, in which the Second Circuit grappled with whether the DOE could augment an inadequate IEP with testimony that "certain services not listed in the IEP would actually have been provided to the child if he or she had attended the … proposed placement." *See* 694 F.3d at 185. The Second Circuit held that such testimony was impermissible in the context of a *Burlington/Carter* hearing. *See id.* at 186.[7] As the Second Circuit explained, "parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision," and allowing the DOE to create a defective IEP and then augment at the impartial hearing with curative testimony would essentially permit the DOE to effect a "bait and switch." *See id.* Therefore, "parties are limited to discussing the placement and services … reasonably known to the parties at the time of the placement decision." *Id.* at 187.

While *R.E.* dealt specifically with whether the DOE could remedy a defective IEP with retrospective testimony, later cases have dealt with whether the DOE can similarly remedy a defective placement. In *B.R. ex rel. K.O.* v. *New York City Department of Education*, the plaintiffs alleged that the DOE's proposed placement failed to provide their child with one-on-one occupational therapy, as recommended by the IEP. 910 F. Supp. 2d 670, 675 (S.D.N.Y.

---

[7] A *Burlington/Carter* hearing is one where the parties litigate whether a parent who unilaterally places their child in a private school may obtain tuition reimbursement under the IDEA. *See C.F. ex rel. R.F.* v. *N.Y.C. Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014); *see generally Sch. Comm. of the Town of Burlington* v. *Dep't of Educ. of Mass.*, 471 U.S. 359 (1985); *Florence Cnty. Sch. Dist. Four* v. *Carter*, 510 U.S. 79 (1993).

2012).  The court found that it could only consider "whether, at the time B.R. was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP."  *Id.* at 677.  In *D.C. ex rel. E.B.* v. *New York City Department of Education*, discussed above, the plaintiff alleged that the DOE's proposed placement was inadequate because it was unable to offer a seafood-free environment, as required by the IEP.  *See* 950 F. Supp. 2d at 508-09.  Witnesses for the DOE testified at the impartial hearing that if the student had enrolled at the proposed placement, "the school could have taken the steps necessary to provide a seafood free environment," which the plaintiff characterized as an impermissible attempt "to change the record as it existed at the time" the plaintiff made the placement decision.  *See id.* at 509.  Indeed, it was clear in *D.C.* that at the time the plaintiff was making his or her decision, the proposed placement was not free of seafood.  *See id.* at 511-12.  The district court found that the DOE's attempts to testify as to what the proposed placement could have done were retrospective testimony, and explained that testimony about a placement "must be limited to information that was reasonably known to the parties at the time of the placement decision."  *See id.* at 512-13.  Finally, the Second Circuit has reaffirmed "that challenges to a school district's proposed placement school must be evaluated prospectively," quoting favorably the language from *B.R.* that the court's evaluation should focus on whether, at the time of the placement decision, the proposed school could offer services in line with the IEP.  *See M.O.*, 793 F.3d at 244 (quoting *B.R.*, 910 F. Supp. 2d at 677).

The Court acknowledges that the line of cases extending from *R.E.* to *M.O.* is ambiguous as to whether courts and state administrators are meant to apply a subjective or an objective standard as to what testimony may be considered in a *Burlington/Carter* hearing. For example, there is language in *D.C.* that might lead a reader to believe, as Plaintiff does, that the relevant inquiry is what information the parent personally knew or had been told at the time of the placement decision. *See* 950 F. Supp. 2d at 512 (explaining that information about possible accommodations for the student "was never provided to D.C. and there is no evidence that, at the time D.C. had to make her placement decision, she had any knowledge of the procedures that P188 could have undertaken"). However, when read together, the cases are clear that the Second Circuit instituted, and sister courts have implemented, an objective standard. *See, e.g., R.E.*, 694 F.3d at 187 ("[B]oth parties are limited to discussing the placement and services ... *reasonably known* to the parties at the time of the placement decision." (emphasis added)); *D.C.*, 950 F. Supp. 2d at 512-13 ("[T]estimony ... must be limited to information that was *reasonably known* to the parties at the time of the placement decision." (emphasis added)); *B.R.*, 910 F. Supp. 2d at 677 ("[T]he Court evaluates whether, at the time B.R. was actually considering the proposed placement, the school could offer occupational therapy in line with the IEP."). Not only is an objective standard in line with precedent and practice, but it also ensures that plaintiffs cannot preclude testimony about a school's ability to accommodate their child by strategically choosing not to ask certain questions.

Given the objective standard that governs the rule prohibiting retrospective testimony, it is clear that neither the IHO nor the SRO erred in relying on Hodge's testimony. Hodge did not testify about services, resources, or personnel that Spectrum did not have or offer at the time of Plaintiff's placement decision, but could speculatively have obtained if Sh.K. were to enroll. Instead, Hodge testified solely as to services, resources, and personnel that Spectrum offered at the time Plaintiff was making her decision and that Plaintiff would have reasonably known about. (*See, e.g.,* Tr. 202:20-203:8 (explaining the manner in which Spectrum's occupational therapists and physical therapists work with students)). This is completely distinguishable from the situation in *D.C.*, where the relevant proposed school was not a seafood-free environment, as required, at the time of the placement decision, and the DOE's testimony was focused on how the school could have become seafood-free. *See* 950 F. Supp. 2d at 512. There was no error in the IHO or the SRO relying on Hodge's testimony regarding services that Spectrum offered at the time of Plaintiff's decision, and there is nothing barring this Court from considering that same testimony on appeal.

### 3. The Court Defers to the SRO's Decision Regarding Spectrum's Ability to Implement the IEP's Conductive Education Goals

Plaintiff raises two final, interrelated challenges to the SRO's decision regarding conductive education. (Pl. Br. 10-14). Specifically, Plaintiff argues that: (i) the IEP adopted the conductive education methodology, and therefore required, that Sh.K. be instructed using conductive education; and (ii) Spectrum was unable to implement the IEP's conductive education goals.

(*Id.*).  As discussed previously, although the SRO was skeptical as to whether the IEP adopted conductive education (SRO Dec. 19-20), her finding that Spectrum would nonetheless be capable of fully implementing Sh.K.'s IEP assumed that the IEP did, in fact, require conductive education (*id.* at 20, 22). Therefore, the Court need not determine whether the IEP adopted the conductive education methodology as a matter of law, as the inquiry is not dispositive.[8]

Instead, the Court turns to whether the SRO erred in determining that Sh.K.'s IEP could be implemented at Spectrum.  This is exactly the kind of question that the Court lacks the specialized knowledge and institutional competence to adjudicate.  *See E.H.* v. *N.Y.C. Dep't of Educ.*, 611 F. App'x 728, 730 (2d Cir. 2015) (summary order) (explaining that courts must be "mindful that the judiciary lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy" (quoting *M.H.*, 685 F.3d at 240)).  Moreover, the Second Circuit has noted that deference is

---

[8]    With that said, the Court shares the SRO's skepticism as to whether the IEP implicitly adopted conductive education.  Plaintiff's argument in favor of adoption relies almost entirely on *F.B.* v. *New York City Department of Education*, 132 F. Supp. 3d 522, 551 (S.D.N.Y. 2015), in which a district court found that an IEP that used terminology specific to a certain methodology "embraced" that particular methodology.  (Pl. Br. 11-12).  However, as the DOE notes (Def. Br. 18-19), *F.B.* predates the Second Circuit's decision in *A.M.* v. *New York City Department of Education*, 845 F.3d 523, 543 (2d Cir. 2017), in which the Second Circuit explained that an IEP is inadequate when it fails to provide services consistent with a "clear consensus" of the CSE meeting.  Given that operative rule, it is unclear from the record that such a clear consensus existed.  In her testimony, Ortiz stated both that "conductive education is equivalent to physical education" (Tr. 101:4-7), and that the only reason the CSE used the term conductive education in the IEP is because iHope "sa[id] that they do physical education and they call it conductive education, and that is why we label it as such on our IEP" (*id.* at 137:19-21).  Therefore, it is far from certain that there was a clear consensus that the CSE intended for conductive education to be required.

warranted when "state administrators weight the evidence about proper teaching methodologies," including whether the DOE's choices are "likely to produce progress" toward a student's goals without the use of an adopted methodology, "and explain their conclusions." *Cf. E.H.*, 611 F. App'x at 731 (explaining that SRO erred in finding that the DIR/Floortime method was not required because it did not properly assess the necessity of that method).

Here, there is no question that the SRO carefully and thoroughly weighed the evidence regarding whether Spectrum needed to offer conductive education in order to ensure that Sh.K. was likely to make progress toward her conductive education goals. As already discussed, the SRO correctly cited the relevant case law and legal standards; provided a detailed, record-based description of conductive education; and offered a close analysis of the overlap between the IEP's conductive education goals and its physical therapy and occupational therapy goals. (*See* SRO Dec. 17-22). Plaintiff's only argument against Spectrum's ability to implement the IEP's conductive education goals is that Spectrum did not have a conductive education teacher, or "conductor." (Pl. Br. 12-13). However, Plaintiff points to no evidence in the record supporting the proposition that it is impossible for Spectrum to implement the conductive education goals without having a conductor on staff.

Indeed, Plaintiff only cites to two pieces of evidence: a primer on conductive education (Ex. M), and Crane's testimony before the IHO. Neither supports Plaintiff's proposition. The primer, entitled "Conductive Education: History, Definition, and Basic Concepts," provides a thorough description of the

conductor's education and role within the methodology (*see id.* at 10), but at no point does it state that conductive education exercises can only be led by trained conductors. Similarly, Crane's testimony before the IHO establishes that only individuals who have received a specialized education may qualify as conductors (*see* Tr. 532:3-17), but it does not support the proposition that non-conductors cannot assist students in conductive education exercises. In fact, Plaintiff's own testimony indicates that non-conductors are capable of helping implement conductive education goals. (*See* Tr. 314:24-316:19 (testifying that Plaintiff helped incorporate whatever exercises Sh.K. did at school to the home environment, and also that Plaintiff was trained by a conductive education teacher to assist in such a way)). Thus, any attempt by Plaintiff to demonstrate that the SRO's decision was faulty is unsuccessful.

Given the fact that the SRO's decision was thorough, well-reasoned, and based in the record, the Court can find no reason why it should not defer to the SRO's careful consideration of the issue at hand, and therefore deems Plaintiff's challenge regarding the conductive education goals to be without merit. The Court defers to the SRO's determination that Sh.K. was not denied a FAPE, and thus does not reach the issue of whether Plaintiff's unilateral placement was appropriate or whether equitable considerations were in her favor.

**CONCLUSION**

For the reasons set forth in this Opinion, Plaintiff's motion for summary judgment is DENIED and the DOE's motion for summary judgment is GRANTED. Plaintiff's request for reimbursement of the cost of tuition for the 2016-2017 school year at Pathways, and for RSAs at Pathways, is DENIED.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:   March 13, 2020
       New York, New York

                                                 _____
                                                   KATHERINE POLK FAILLA
                                        United States District Judge